1   David P. Moody (WSBA No. 22853)
    HAGENS BERMAN SOBOL SHAPIRO LLP
2   1301 Second Avenue, Suite 2000
    Seattle, WA 98101
3   Telephone: (206) 623-7292
    Facsimile: (206) 623-0594
4   Email: davidm@hbsslaw.com

5   *Attorneys for Plaintiff M. S.*

6

**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

| | |
|---|---|
| M.S. a minor, by and through her parents and legal guardians, DAVID STRODE and SARAH STRODE, | **CIVIL ACTION NO.:** |
| Plaintiff, | **COMPLAINT** |
| v. | |
| WINSTON BROWN individually and in his official capacity acting under color of State law; LUKE CONNOLLY, individually and in his official capacity acting under color of State law; DAVID OTEBELE, individually and in his official capacity acting under color of State law; and, RACHEL SANDERS (STRAW), individually and in her official capacity acting under color of State law, | **JURY DEMAND** |
| Defendants. | |

## I.    INTRODUCTION

1.      This lawsuit arises from the gross negligence, and deliberate indifference, of the State of Washington, Department of Children, Youth and Families ("DCYF"), and the named defendants in this lawsuit, that resulted in Plaintiff M.S. sustaining catastrophic brain injuries from oxygen deprivation.

2.      M.S. can no longer walk, talk, eat, or breathe independently, and requires continuous medical supervision for the rest of her life.

3.      DCYF's "Mission" is to "protect children" and boasts that it is guided by a "relentless focus on outcomes for children" and a "commitment to collaboration and

COMPLAINT - 1

1  transparency."[1]

2      4.      Again and again, the named defendants failed to protect M.S.

3      5.      On December 14, 2021, M.S. was born with heroin in her system.

4      6.      The bio-parents admitted using heroin, methamphetamine, and marijuana while

5  pregnant with M.S.

6      7.      M.S. spent three weeks in the hospital weaning the drugs out of her system.  This

7  provided DCYF with ample time to assess whether M.S. could be reunited with her parents, or

8  alternatively, find a safe placement for M.S.

9      8.      DCYF, including the named defendants, knew that M.S.'s biological parents ("bio-

10  parents") were drug-addicts and not fit to care for a child.

11      9.      About two years earlier, DCYF terminated the bio-parents' rights to M.S's older

12  sister because the older sister was born with drugs in her system.

13      10.     DCYF concluded placing M.S. with the bio-parents was dangerous and would

14  **"lead to substantial harm of the child**."

15      11.     Instead, DCYF decided to place M.S. with her maternal grandmother, Corena

16  Barnett ("Corena").  However, significant barriers existed for safe placement.  Corena worked

17  graveyard shifts, lived alone, and the drug-addicted bio-parents planned to move in with Corena.

18      12.     DCYF Area Administrator Winston Brown warned against the placement, stating:

19  "I don't see how you could properly safely plan, **especially through the night**."

20      13.     DCYF ignored this warning from its own Area Administrator, failed to implement

21  a safety plan, and failed to provide childcare during the hours that Corena worked at night.

22      14.     A court order prohibited the bio-parents from unsupervised visits.  DCYF knew

23  about this Court order, yet never informed Corena of this critical restriction.

24      15.     Despite Corena's repeated pleas for help, DCYF did not respond.

25      16.     The consequences were catastrophic.

26      17.     On January 27, 2022, at 6 weeks old, M.S. suffocated in the bed of her bio-parents

27  during the early morning hours while Corena worked her graveyard shift.

28  [1] *See* https://dcyf.wa.gov/about/mission-vision-values; https://dcyf.wa.gov/about/about-us.

COMPLAINT - 2

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

18.     Emergency responders restored M.S.'s breathing, but the oxygen deprivation caused permanent and devastating brain damage. DCYF's reckless actions transformed a healthy newborn into a child requiring intensive medical care to survive. M.S. will never recover.

## II.     PARTIES

19.     Plaintiff M.S. is a profoundly injured, vulnerable and disabled 3-year-old girl. M.S. resides in Pierce County, Washington. David Strode and Sarah Strode are M.S.'s parents and legal guardians.

20.     Defendant Winston Brown is a current or former employee of the State of Washington, Department of Children, Youth and Families, aka DCYF. Upon information and belief, Defendant Brown resides in the State of Washington.

21.     Defendant Luke Connolly is a current or former employee of the State of Washington, Department of Children, Youth and Families, aka DCYF. Upon information and belief, Defendant Connolly resides in the State of Washington.

22.     Defendant David Otebele is a current or former employee of the State of Washington, Department of Children, Youth and Families, aka DCYF. Upon information and belief, Defendant Otebele resides in the State of Washington.

23.     Defendant Rachel Sanders (Straw) is a current or former employee of the State of Washington, Department of Children, Youth and Families, aka DCYF. Upon information and belief, Defendant Sanders resides in the State of Washington.

## III.     JURISDICTION AND VENUE

24.     This Court has jurisdiction under 28 U.S.C. §1331. Federal question jurisdiction arises pursuant to 42 U.S.C. § 1983.

25.     Venue is proper pursuant to 28 U.S.C. §1391 because the events giving rise to this action occurred in this District and one or more Defendants resides in this District.

## IV.     STATEMENT OF FACTS

**A.     DCYF Investigates M.S.'s Safety After She is Born with Heroin In her System**

26.     On December 14, 2021, Suzanne Kelley (the "bio-mom") gave birth to M.S. (then

COMPLAINT - 3

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    named J.K.) at UW Medical Center.

2        27.    M.S. was born with heroin in her system.

3        28.    DCYF assumed legal responsibility for M.S. and investigated M.S.'s bio-parents.

4        29.    On December 15, 2021, Defendant Luke Connolly was assigned to the referral and

5    began the initial birth intake investigation. During this investigation, Defendant Connolly learned

6    that the bio-parents had their parental rights previously terminated for M.S.'s older sister.

7        30.    Defendant Connolly completed initial face-to-face interviews with M.S.'s bio-

8    parents.

9        31.    During these interviews, M.S.'s bio-mom admitted using heroin and narcotics

10   within 24 hours of M.S.'s birth and to abusing methamphetamine in the days before giving birth.

11   Trevor Kelley (the "bio-dad") also admitted to using heroin, methamphetamine, and marijuana.

12       32.    For over three weeks, hospital staff weaned M.S. from the drugs in her system.

13       33.    During this time, DCYF conducted an investigation. Defendant Connolly and

14   Defendant David Otebele, who supervised Connolly, spoke with the bio-parents and UW Medical

15   Center staff while investigating.

16       34.    UW Medical Center social work staff confirmed DCYF's concerns. Hospital staff

17   reported that M.S.'s bio-parents lacked basic parenting skills. Hospital staff made several attempts

18   to teach the bio-parents how to dress M.S. and keep her warm. Those attempts were not successful.

19   The bio-parents were unable or unwilling to learn how to keep M.S. safe.

20       35.    M.S.'s bio-parents (who were abusing drugs and often homeless) used UW Medical

21   Center as a makeshift hotel.  M.S.'s bio-parents arrived late at night, slept through M.S.'s feeding

22   times, and disappeared in the morning.

23       36.    Due to these concerns, Defendant Connolly created an Action Plan with the parents

24   to ensure M.S.'s safety upon her eventual release from the hospital.

25       37.    Step 1 of the Action Plan stated: "The Department and family will create and

26   develop a safety plan upon [M.S.]'s discharge from the hospital to ensure [M.S.]'s overall safety

27   and general well-being."

28       38.    On December 20, 21 and 22, 2021, Defendant Connolly attempted to reach the bio-

COMPLAINT - 4

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1 parents to discuss the Family Action Plan and formation of a safety plan for M.S.'s release but

2 failed to reach them.

3      39.      On January 4, 2022, Defendant Otebele found that a safety plan for M.S.'s release

4 to her bio-parents could not be completed due to the safety threats the bio-parents posed.

5      40.      As a result, on January 5, 2022, Defendant Connolly submitted a dependency

6 petition report. The report determined that M.S.'s bio-parents: (1) failed to visit M.S.; (2) showed

7 little interest in her recovery; (3) were unable to control their own behavior; and (4) were unable

8 to perform basic parental tasks.

9      41.      The report stated that the bio-parents behavior impacts child safety, and that

10 discharging M.S. to their care could "lead to substantial harm of the child [M.S.]."

11      42.      Defendants Connolly and Otebele concluded that M.S. could not be placed with her

12 bio-parents due to these concerns.

13 **B.      Defendants' Dangerous Placement Decision**

14      43.      Once the Defendants realized that M.S.'s bio-parents created a substantial risk of

15 harm to M.S., DCYF began assessing whether M.S. could be placed with her maternal

16 grandmother Corena Barnett ("Corena").

17      44.      Significant barriers existed for safe placement with Corena:

18           a.      Corena worked a graveyard shift;

19           b.      Corena lived on her own;

20           c.      no one was identified who could watch M.S. while Corena worked during

21                the night; and

22           d.      the bio-parents assumed they could move in with Corena without

23                restrictions.

24      45.      Corena raised these issues with Defendant Connolly and other employees of DCYF,

25 but Corena's concerns were dismissed and she was assured that DCYF would provide assistance

26 to find childcare (a safe care provider for M.S. while Corena worked at her job through the night).

27      46.      Prior to placement, DCYF and the Defendants did nothing to help Corena find

28 childcare.

COMPLAINT - 5

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE     (206) 623-0594 FAX

47.     DCYF knew that placing M.S. with Corena posed significant safety issues, did nothing to address those issues, yet urged Corena to take M.S. anyway.

48.     On January 4, 2022, Defendant Connolly called Corena and convinced her to take care of M.S. and to allow the bio-parents to move in with her.  Corena agreed to pick up M.S. from the hospital the following day:



> January 4th. I got a call from Luke, the case worker in Seattle. He talked me into letting [S.K.] and Trevor live with me and take care of Jade.

49.     Before M.S. was placed with Corena, Defendant Rachel Sanders conducted a cursory walkthrough of Corena's home to assess whether it was appropriate for M.S.'s placement.

50.     During the walkthrough, Defendant Sanders did not raise any concerns about Corena's home.

51.     Following the walkthrough, Defendant Sanders emailed Defendant Otebele expressing concerns about the placement of M.S. with Corena. Defendant Sanders acknowledged that Corena appeared unaware of what she was getting into, both bio-parents were in active addiction, and Corena worked the graveyard shift.

52.     On January 4, 2022, the same day Defendant Connolly called Corena to convince her to take M.S., Defendant Winston Brown, a DCYF Area Administrator, warned against placing M.S. with Corena, stating: "With grandmother [Corena] currently working **I don't see how you could properly safely plan, especially through the night** … [b]eing that there are gaps and an unsafe baby who is currently coming off morphine due to withdrawals[.]"

53.     Defendant Brown advised against placing M.S. with Corena, stating there was no adequate safety plan in place.

54.     Instead, Defendant Brown recommended placing M.S. in foster care while the bio-parents moved in with Corena.  DCYF could re-assess placement **after** the bio-parents demonstrated they were no longer addicted to drugs and could provide Corena with the necessary

COMPLAINT - 6

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    support to supervise M.S. throughout the middle of the night.

2        55.    Despite Defendant Brown's clear warning against placement, the Defendants

3    proceeded anyway.

4        56.    After warning the placement was unsafe, Defendant Brown never followed up.

5        57.    Defendants proceeded with the placement despite knowing it was fundamentally

6    unsafe because: (1) Corena worked the graveyard shift; (2) the drug-addicted bio-parents were

7    moving in; and (3) no additional supervision or childcare was arranged by DCYF.

8    **C.    Defendants Place M.S. with Corena Despite Red Flags**

9        58.    On January 5, 2022, M.S. (3 weeks old) was released to Corena.

10        59.    On January 6, 2022, a Shelter Care Order was entered in the King County Juvenile

11    Court. Defendant Connolly attended the shelter care hearing.

12        60.    The Shelter Care Order stated that releasing M.S. to her bio-parents would result in

13    "serious threat of substantial harm" to M.S.:

14    ☒    It is currently contrary to the welfare of the child to remain in or return home. The child is in need of shelter care because there is reasonable cause to believe:

15        ☒    The child has no parent, guardian, or legal custodian to provide supervision or care for such child; and/or

16        ☒    The release of the child would present a serious threat of substantial harm to the child; and/or

17

18        61.    Under the Shelter Care Order, the bio-parents were allowed to live with M.S. and

19    Corena, but were prohibited from unsupervised contact with M.S.:

20    ☒    As follows: The parents are authorized to reside with the placement under conditions specified above. During such time as the parents reside in the home of the maternal grandmother, an approved relative,

21    approved by DCYF or the placement, shall supervise visits between the parents and the child in the home while the grandmother is working outside the home. Otherwise, the child shall be enrolled in daycare while

22    the maternal grandmother is working outside the home. The parents shall not be under the influence during any visits or the visits may be terminated by either the maternal grandmother or other relative supervising the

23    visits.

24        62.    None of the Defendants, nor any other employee of DCYF, ever informed Corena about the Court-ordered restrictions or provided Corena with a copy of the January 6, 2022 Court

25    Order.

26        63.    None of the Defendants, nor any other employee of DCYF, ever approved a

27    relative, other caregiver, or ensured that M.S. was "enrolled in daycare" while Corena was

28

COMPLAINT - 7


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1  working.

2        64.    After bringing her home on January 5, 2022, Corena took three weeks off from her

3  job to care for M.S..

4        65.    This three-week period provided Defendants and other DCYF employees even

5  more time to schedule childcare, vet and approve alternative caregivers, and/or provide any other

6  supports to ensure M.S.'s safety.

7        66.    During this time, Defendants could have (and should have!) informed Corena about

8  the Shelter Care Order requirements.

9        67.    On January 15, 2022, Defendant Connolly, who attended the shelter care hearing

10  himself, called Corena regarding her plans for childcare. Despite this explicit discussion about the

11  need for supervision while Corena worked, Defendant Connolly failed to inform Corena about the

12  Shelter Care Order requirements.

13        68.    Meanwhile, Corena desperately searched for childcare for M.S.. Despite her best

14  efforts, she was unable to find childcare on her own.

15        69.    Corena begged DCYF for assistance to secure childcare during the late-night hours.

16  During Corena's graveyard shift, M.S. would be most vulnerable.

17        70.    Corena called two DCYF caseworkers, both were on vacation.

18        71.    A few days before Corena was required to return to work, she reached out to DCYF

19  again in a final, desperate attempt for assistance.  No one from DCYF returned her call.

20        72.    Despite the Court Order requiring approved caregivers, none of the Defendants, nor

21  any other employee of DCYF, approved any caregivers or arranged for alternative or respite care.

22  **D.     M.S. Suffocates ("Substantial Harm to the Child")**

23        73.    On January 27, 2022, Corena was working the graveyard shift.

24        74.    At 6 weeks old, M.S. suffocated in the bed of her bio-parents during the early

25  morning hours.

26        75.    M.S. was found face-down and not breathing.

27        76.    At approximately 4:45 a.m., the bio-parents called 911 and Cowlitz County EMS

28  transported M.S. to the hospital.

COMPLAINT - 8

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

77.    Detectives from the Kelso Police Department responded to the scene and found evidence of heroin use and "co-sleeping" between M.S. and the bio-parents.

78.    M.S. was taken to St. John Hospital in Vancouver, Washington. Once EMS restored M.S.'s breathing, M.S. was transferred to Randall Children's Hospital in Portland, Oregon.

79.    DCYF and the Kelso Police Department conducted investigations into M.S.'s suffocation.

80.    During the investigation (which was after M.S. had been suffocated), DCYF informed Corena (for the first time) that the January 6, 2022 Shelter Care Order placed restrictions on M.S.'s bio-parents.

81.    Neither Defendant Connolly nor any other employee of DCYF, ever shared the Order with Corena, and never told Corena that she could not leave M.S. unsupervised with her bio-parents:

> "I thought they (parents) were able to care for their own child" Corena said. "I did not know they were not able to take care of their own child." She stated. "Otherwise, that would never have happened."

82.    Defendant Connolly or any other employee of DCYF could have (and should have!) provided the January 6, 2022 Shelter Care Order -- or explained the Court's Order -- to Corena at any time. They chose not to.

83.    The recklessness of Defendant Connolly's actions is astounding -- on January 4, 2022, Defendant Connolly convinced Corena to take in M.S. and her bio-parents. *See* Complaint at ¶ 48. Two days later, the January 6, 2022 Shelter Care Order prohibited the bio-parents from having unsupervised contact with M.S. Defendant Connolly attended the court hearing. Yet, Defendant Connolly never followed up to inform Corena of this restriction.

E.    **DCYF's Near-Fatality Review Reveals Defendants' Failures to Protect M.S.**

84.    On April 14, 2022, DCYF conducted a child near-fatality review. The review analyzes the failures that led to a child's injuries and develops recommendations to protect future children in DCYF's care.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

85.     The child near-fatality review identified that DCYF "needed a sense of urgency in planning for [M.S.'s] individual care needs" and identified two key failures.

86.     **DCYF's first key failure**: DCYF never completed a Plan of Safe Care ("POSC"). A POSC is required under DCYF's policies.  The POSC would have identified where M.S. and Corena needed additional support -- including child or respite care provided while Corena worked. The POSC also would have outlined DCYF's expectations of care -- including that M.S.'s bio-parents were prohibited from caring for M.S. unsupervised.

87.     **DCYF's second key failure**: DCYF failed to complete timely health and safety visits with M.S. to assess her safety and well being.

88.     DCYF admitted it failed to protect M.S.  DCYF never completed a required safety plan and failed to timely assess M.S.'s needs.

89.     These defendants (Brown, Connolly, Otebele and Sanders) each, acting under color of State law, violated the civil rights of M.S., as identified in the child near-fatality review.

**F.    Despite the Failures Set Forth in the Near-Fatality Review – DCYF Blames Corena**

90.     Following its child near-fatality review, DCYF investigated Corena for negligent treatment or maltreatment.

91.     On May 5, 2022, DCYF determined that allegations of negligent treatment or maltreatment against Corena were "founded."

92.     On May 13, 2022 Corena wrote a letter to DCYF outlining the same deficiencies DCYF identified in its child near-fatality review.  M.S. and Corena received no support, no plan, and no help:

I was not Told By luke that they couldn't take care of their own Baby. The cps worker and her Supervisor in kelso were Both on Vacation, so I was not in touch with them. I had no help!

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

93.     Defendant Brown, who previously advised against placement with Corena, conducted a review of DCYF's founded determination under RCW 26.44.125.

94.     Defendant Brown knew that DCYF could not ensure M.S.'s safety. As the Area Manager for DCYF, Defendant Brown notified and warned the other named defendants **before** M.S. was placed in Corena's care. *See* Complaint at ¶¶ 52-55.

95.     Defendant Brown never followed-up to ensure M.S. was safe. Yet, **after** M.S. was brain damaged, Defendant Brown blamed Corena.

96.     Defendant Brown upheld DCYF's findings of negligent treatment or maltreatment against Corena.

97.     For many years, Corena worked at an assisted living facility. Corena's employment was contingent on her ability to pass periodic background checks.

98.     As a result of DCYF's founded determination, Corena failed the next scheduled background check and was fired by her employer in 2024.

**G.     M.S.'s Catastrophic Injuries**

99.     As a direct result of the suffocation, M.S. was deprived of oxygen to the brain, causing permanent and devastating brain damage. She can no longer walk, talk, see, hear or interact with her surroundings.



100.    On her best days, M.S. can raise her arm a few inches and smile while taking a bath. These moments represent the extent of M.S.'s abilities.

101.    M.S. is unable to eat on her own.

COMPLAINT - 11

102.    M.S. is unable to breathe on her own.  A trachea tube connects to equipment that forces air into her lungs and removes mucus that would otherwise block her airways.

103.    M.S. cannot control her eyelids and requires eye drops multiple times each day.

104.    M.S. experiences "neurostorming" events, where her nervous system activates everywhere at once, causing widespread seizures.  These seizures are extremely painful.

105.    Some days, M.S. will experience up to sixty seizures.  When the seizures are triggered, M.S.'s entire body will tighten, her eyes roll back in her head, her hands ball into fists, and her toes curl in pain.

106.    Recovery is impossible.  M.S. has permanent brain damage and will continue to suffer for the rest of her life.

107.    DCYF's gross negligence transformed M.S., a healthy newborn, into a child who requires intensive medical care to survive each day.



**F.      M.S. Joins the Strode Family**

108.    While M.S. received treatment at Randall Children's Hospital in Portland, Oregon, DCYF contacted David and Sarah Strode.

109.    The Strodes have built a reputation within the foster care system as a family who opens their homes to medically complex children.

COMPLAINT - 12

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

110.    On February 28, 2022, Sarah drove to Oregon and met M.S.. From the first meeting, David and Sarah agreed to foster (then adopt) M.S..

111.    The Strodes brought M.S. home when she was less than three months old.

112.    David and Sarah Strode committed to providing M.S. with the best care, monitoring her oxygen levels, ensuring her airways were clean, and attending dozens of medical appointments each week with specialists ranging from neurologists to physical therapists to dieticians.

113.    M.S. requires round-the-clock supervision. David and Sarah could not sleep through the night. They set alarms through the night to check on M.S., administer medication, apply eye drops to prevent her eyes from drying out, keep her clean, and help give M.S. a sense of calm, loving security.

114.    On May 5, 2023, the Strodes adopted M.S..

115.    At the adoption, DCYF acknowledged: *"Sarah and David [Strode] have provided M.S. with an environment full of unconditional love and support that no other home surely could. They don't see a child with severe medical diagnoses, they see their daughter...It is truly heart-warming and awe-inspiring."*

## V.    CAUSES OF ACTION: VIOLATIONS OF 42 U.S.C. § 1983

1.    **Defendant Brown** caused Plaintiff to be subjected to the deprivation of her constitutional rights by directly participating in the deprivation, or by setting in motion a series of events by others which Defendant Brown knew or reasonably should have known would cause others to violate Plaintiff's civil rights.

2.    As a direct and proximate result of Defendant Brown's violation of Plaintiff's civil rights, Plaintiff is entitled to an award of damages, including general, special and punitive damages, and attorneys' fees and costs.

3.    **Defendant Connolly** caused Plaintiff to be subjected to the deprivation of her constitutional rights by directly participating in the deprivation, or by setting in motion a series of events by others which Defendant Connolly knew or reasonably should have known would cause others to violate Plaintiff's civil rights.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    4.    As a direct and proximate result of Defendant Connolly's violation of Plaintiff's

2 civil rights, Plaintiff is entitled to an award of damages, including general, special and punitive

3 damages, and attorneys' fees and costs.

4    5.    **Defendant Otebele** caused Plaintiff to be subjected to the deprivation of her

5 constitutional rights by directly participating in the deprivation, or by setting in motion a series of

6 events by others which Defendant Otebele knew or reasonably should have known would cause

7 others to violate Plaintiff's civil rights.

8    6.    As a direct and proximate result of Defendant Otebele's violation of Plaintiff's civil

9 rights, Plaintiff is entitled to an award of damages, including general, special and punitive

10 damages, and attorneys' fees and costs.

11    7.    **Defendant Sanders** caused Plaintiff to be subjected to the deprivation of her

12 constitutional rights by directly participating in the deprivation, or by setting in motion a series of

13 events by others which Defendant Sanders knew or reasonably should have known would cause

14 others to violate Plaintiff's civil rights.

15    8.    As a direct and proximate result of Defendant Sanders's violation of Plaintiff's civil

16 rights, Plaintiff is entitled to an award of damages, including general, special and punitive

17 damages, and attorneys' fees and costs.

18                            **VI.    JURY DEMAND**

19      Plaintiff hereby requests a trial by jury on all claims.

20                        **VII.    PRAYER FOR RELIEF**

21      WHEREFORE, Plaintiff prays for the following relief:

22          A.  Judgment against each Defendant for special and general damages;

23          B.  Punitive damages;

24

25

26

27

28

COMPLAINT - 14

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

C.  Prejudgment interest;

D.  An award of attorneys' fees and costs; and

E.  Further relief as the Court deems just and equitable.

DATED this 21st day of October 2025.

HAGENS BERMAN SOBOL SHAPIRO LLP

By:  *David P. Moody*

David P. Moody, WSBA No. 22853
Ryan Pittman, WSBA No. 57560
Emma Morse, WSBA No. 9914046

1301 Second Avenue, Suite 2000
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: davidm@hbsslaw.com
        ryanp@hbsslaw.com

*Attorneys for Plaintiff M.S.*

COMPLAINT - 15

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX